IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| United States Of America, | ) |
| | ) |
| v. | ) No. 06 CR 334 |
| | ) Judge Ronald A. Guzmán |
| Carl Gordon, | ) |

**MEMORANDUM OPINION AND ORDER**

Defendant, Carl Gordon, moves the court to dismiss the indictment in the above-captioned case on the ground that the government's prosecution is barred by the statute of limitations. Alternatively the defendant moves this court to dismiss the indictment for lack of venue. For the reasons given below, the motion is denied.

The indictment charges that on or about August 10, 2001 the defendant, an alien who had previously been deported and removed from the United States on or about January 3, 1990, was present and found in the United States without having previously obtained express consent of the Attorney General for reapplication for admission into the United States in violation of Title 8 United States Code §§ 1326(a) and 1326(b)(2). Section 1326(a) provides:

> Subject to subsection (b) of this section, any alien who--
> (1) has been denied admission, excluded, deported, or removed or has departed the United States while an order of exclusion,

> deportation, or removal is outstanding, and thereafter
>
> **(2)** enters, attempts to enter, or is at any time found in, the United States, unless (A) prior to his reembarkation at a place outside the United States or his application for admission from foreign contiguous territory, the Attorney General has expressly consented to such alien's reapplying for admission; or (B) with respect to an alien previously denied admission and removed, unless such alien shall establish that he was not required to obtain such advance consent under this chapter or any prior Act,
>
> shall be fined under Title 18, or imprisoned not more than 2 years, or both.

(8 U.S.C. § 1326(a).)

Defendant's motion to dismiss is predicated upon the argument that the statute of limitations begins to run the moment immigration authorities discover the offending alien's illegal presence in the United States. Defendant argues that aliens who enter the United States through an official port of entry are deemed to have completed their crimes at the time of successful entry because, at that moment, immigration authorities are alerted to the illegal reentry itself and can, through the exercise of diligence typical of law enforcement authorities, discover the violation. Aliens who enter the country at an unauthorized location, however, complete their offense the moment they are eventually "found in" the United States by immigration authorities. Since the defendant in this case reentered the United States less than one week before November 8, 1995 through the official port of entry at San Ysidro, California and did so by presenting his (expired) green card to the U.S. immigration officials at the official port of entry, it was at this

time that the crime was complete.[1] Therefore, defendant argues, the statute of limitations in this case expired years before the return of the indictment in this case on May 9, 2006.

The government, on the other hand, maintains that the statute of limitations did not begin to run when the defendant entered the United States because his unlawful entry with an invalid "green card" constitutes a surreptitious reentry. At that time, according to the Government, inspectors generally allowed individuals who presented facially valid green cards to enter the country without further checking on their immigration status. The defendant's possession of a revoked green card was unlawful, because he was required to surrender it upon his deportation. 8 C.F.R. §§ 246.9, 247.14. By presenting his revoked green card the defendant implicitly represented that he still had the status of a lawful permanent resident, something he knew to be false. This, the government argues, is a surreptitious entry which does not trigger the commencement of the statute of limitations.

The defendant relies upon *United States v. DiSantillo*, 615 F.2d 128 (3d Cir. 1980). In that case:

> DiSantillo was "arrested and deported" in 1962 when he was sixteen years of age and that he subsequently entered the United States as an

---

[1] The green card included his name, date of birth, photographs, and fingerprint. He was inspected and granted admission by the immigration authorities upon presentment of his card. Thus, defendant maintains, the immigration authorities had ample knowledge of his reentry to the United States and could have discovered the violation at that time. The offense therefore does not continue beyond that date.

> immigrant on March 23, 1970, with a visa issued by
> the American Consul General in Naples, Italy. He
> was interviewed by agents of the Immigration and
> Naturalization Service in Pittsburgh, Pennsylvania
> in 1976, and on January 16, 1979, nearly nine years
> after his entry into the United States, he was
> indicted under s 1326 on the theory that he made
> misrepresentations in his visa application.

*Id.* at 130. In its analysis, the court determined that Congress must have intended to distinguish between the crimes committed by entry or attempted entry through the regular immigration service procedures, of which the INS would have an official record, and the crime committed by being found in the United States after an alien has made a surreptitious entry, of which the INS would have no official record. If no distinction were intended, there would be no need to provide separate language in the statute describing both one who "enters" and one who is "found in" the United States:

> Congress must have included the word "found" in s 1326 to
> alleviate the difficult law enforcement burden of finding and
> prosecuting this class of illegal aliens, who are already aware that
> they are in violation of the law as evidenced by their surreptitious
> entry, before the five year statute of limitations runs.

*Id.* at 135. The court goes on to find that because DiSantillo entered through a recognized immigration port of entry, the immigration authorities were aware of this entry and could have through the exercise of typical diligence discovered his violation at that time. The American Consulate in Naples, Italy processed and approved his application for a visa and the immigration authorities allowed him to enter New York later in 1970. He filed a report each year with the INS giving his current address. Thus, the government had sufficient opportunities to discover

DiSantillo's offense.

It appears that the *DiSantillo* court based its determination on two factors: First, that the defendant entered only after having followed the required procedure by applying for a visa at the US Consulate in Italy and then being inspected by INS at his entry point, thus giving the government an opportunity to discover his offense. Second, the fact that there was, in the court's mind, serious doubt that DiSantillo intentionally misrepresented any facts or in any way misled the INS at his inspection when he admitted having been previously deported, but not having been arrested. The court was in doubt that DiSantillo knew the difference, or even, that he had in fact been both arrested and deported when he was 16 years old. This case was one where both an opportunity for the government to discover the offense was clearly present and the defendant made no material misrepresentations during his inspection and entry so as to make his entry a surreptitious one.

The defendant also relies upon *United States v. Herrera-Ordones*, 190 F.3d 504 (7th Cir. 1999). In that case the issue was one of venue. In order to determine the proper venue, the court was required to determine where the offense took place, and thus, when the defendant was "found" under 18 U.S.C. § 1326. Darius Herrera-Ordonez was arrested in the United States at Elkhart, Indiana after having been previously deported. When arrested, however, he gave the alias of José Rendon and a false birth date and Social Security number. To the INS he gave still another false name, José Aldelberto Rendon-Contreras, false Social Security number and false place of entry into the United States. A fingerprint analysis subsequently identified the defendant

as Juan Carlos Guzman Gorrea. Eventually, the INS obtained conviction records for Juan Carlos Gorrea, an individual who was deported on April 9, 1997 after a conviction for delivery of heroin in 1992, and also a file on Darius Herrera-Ordones, which showed a deportation as an aggravated felon in June 1994. To further confuse the issue, in another interview with INS Mr. Herrera-Ordonez, while maintaining the alias of José Rendon Contreras, admitted that he had previously been deported and reentered the United States illegally near Brownsville, Texas in approximately April 1996. Finally, on April 19, 1997, the INS received a fingerprint examiner's report that José Aldelbrto Rendon, José Rendon-Contreras and Darius Herrera-Ordonez were one and the same. On August 13, 1987, the defendant was charged with being an alien who reentered without permission and was found in the United States after deportation for an aggravated felony conviction. At trial the defendant asserted that he was "found in" the Northern District of Indiana because his presence there was known to law enforcement and to the INS. The court found that the evidence established that the INS did not confirm the defendant's true identity or status until after he had been transported to the Southern District of Indiana. Therefore, venue was proper in the Southern District.

The court determined that being "found" means being "discovered" in the United States and has two components: first, the INS discovers the physical presence of the deported alien, and second, it ascertains the alien's identity as an illegal alien and status as one who has reentered after previous deportation.

> We are in complete agreement with this assessment of the offense
> and conclude that an alien is "found" within the meaning of § 1326

> when the INS both discovers his presence in the United States and knows that, because of his identity and status, his presence here is illegal.

*Id.* at 510. In considering the defendant's argument that the INS had *constructive* knowledge of his illegal status the court agreed that the "found in" element of §1326(a) requires the Government to exercise reasonable diligence in screening for previously deported aliens. Applying that standard to the facts before it, the *Herrera-Ordonez* court determined that "the INS agents investigated Mr. Herrera-Ordonez' identity and status with appropriate methodical diligence after learning of his presence in the Elkhart county jail." *Id.* at 511. The court found that it was not until the defendant gave the INS the truthful information that he had been deported earlier that the INS could have been expected to know the defendant's identity and status.

Turning to the case before us, the government argues that the defendant's entry was surreptitious because he lied to the INS when he asserted a legal right to enter the United States by proffering his expired green card at the border crossing. The card had been revoked and was illegally possessed by him. In support, the government cites *United States v. Almonte*, No. 98 Cr. 666 (JFK), 998 WL 782023.[2] To conclude that presentation of revoked documentation that correctly identifies the defendant but incorrectly asserts his right to enter the United States

---

[2] In *Almonte*, the defendant reentered the United States by presenting his old green card at an airport immigration checkpoint in Newark, New Jersey. *Id.* at *2. Seven years later the government indicted the defendant and charged him with illegal reentry in violation of 8 U.S.C. §§1326(a) and 1326(b)(2). In that case the court found that the entry was not such as to place the INS on notice that his presence in the United States was illegal. *Id.* at *3. The court reasoned that an alien who presents an apparently valid passport and green card would not present reasonable cause for suspicion. *Id.*

establishes constructive notice for purposes of commencing the running of the statute of limitations, the government argues, "would require a level of diligence that would necessitate background checks on everyone seeking to cross the border in order to authenticate each piece of immigration documentation thereby placing an unreasonable burden on the border authorities, slowing legitimate border crossings to a crawl and interfering with the authorities' ability to focus resources where there (*sic*) are needed to protect the borders."(*Gov't's Resp. Def's Mot. Dismiss Indictment*, at 6.) The defendant, on the other hand, argues that the mere fact that the green card the defendant presented had been revoked and ought to have been surrendered at an earlier date does not defeat the obligation of immigration authorities to exercise that diligence typical of law enforcement authorities in investigating whether the presence of an alien is illegal. The United States Customs Service maintains a computer database available to INS border inspectors at the time of the defendant's illegal reentry and is designed to verify the immigration status of aliens. *Almonte*, 1998 WL 782023 at *3. Defendant also points out that the Eleventh Circuit has concluded that the INS maintains a "service or lookout book" to give notice to INS agents throughout the nation of a person's deportation in order to prevent them from re-entering the United States. *United States v Gay*, 7 F.3d 200, 201 (11th Cir. 1993).

The controlling determination which remains for the Court to make is whether reliance upon the defendant's misrepresentation of his right to reenter the United States by presentation of a revoked permanent resident card which he illegally possessed, constitutes the exercise of reasonable diligence in screening for previously deported aliens; or whether the government was obligated to do more, and having failed to do so, will be charged with having constructive

knowledge of the defendant's illegal presence since the date of his reentry. Neither the Government nor the defendant have provided the Court with a clear picture of what an ordinary border crossing event at San Ysidro entails. How many such crossings take place each day? How much time is allotted or available for each such inspection? What resources do the INS agents at that border crossing point actually have available to them as a practical matter in determining the legality of each such crossing? What is the usual and customary procedure? Does that procedure differ depending on what documentation is produced by the party seeking entry? None of these questions have been sufficiently addressed. The Court, however, takes judicial notice of the The Bureau of Transportation Statistics (BTS)[3] web site found at http://www.bts.gov/publications/north_American_trade_and_travel_trends/boxes/box_3_tabl.html, which states that in 1996 the San Ysidro border crossing station processed 13,782,593 personal vehicles crossing the border from Mexico in to the United States. Those vehicles contained 34,569,739 passengers. In addition, 92,355 buses containing 878,713 passengers were also inspected. Finally, an additional 8,809,794 pedestrians were inspected crossing the border at San Ysidro in 1996. These numbers are not surprising. It is well known that the daily traffic at the US-Mexican border is overwhelming. No doubt, it is these huge numbers that account for the inability of the border crossing agents to check the validity of every seemingly valid entry document presented during the course of an ordinary day. Whether the numbers were precisely the same in 1995 is not certain, but they would not have been all that different. The defendant in

---

[3] The Bureau of Transportation Statistics (BTS) was established as a statistical agency in 1992. It's basic authorizing legislation is the Safe, Accountable, Flexible, Efficient Transportation Equity Act: (SAFETEA-LU) (Pub.L. 109-59, Aug. 10, 2005, 119 Stat. 1144)

this case, as in *Almonte* - and in contrast with DiSantillo - lied to the government about his status and fortified that lie by presenting what he knew to be invalid documentation. The invalidity of that documentation was made all the harder to ascertain upon inspection by virtue of the fact that the documentation was, indeed, an official -government issued- resident alien card. The border crossing agents had no reason to doubt the validity of that documentation, nor did they, under the circumstances, have the ability to check every seemingly legitimate document presented to them by every single one of the tens of thousands of border crossers they inspect on a daily basis. The Court is satisfied that this was a surreptitious entry and that the government had neither actual nor constructive knowledge of the defendant's illegal entry into the United States in 1995 when he crossed the border.

The defendant acknowledges that the 7th Circuit's recent decision in *United States v. Rodriguez-Rodriguez,* 453 F.3d 458 (7th Cir. 2006) establishes that venue does lie in the Northern District of Illinois even if the defendant's crime was complete in the Southern District of California, his point of entry. Therefore, the defendant's challenge to this court's venue is deemed abandoned.

For the reasons given above, the motion to dismiss the indictment is denied.


Dated: August 3, 2006


**SO ORDERED**	**ENTER:**

_____
RONALD A. GUZMÁN
District Judge